MICHAEL STEIN, ESQ.
Nevada Bar No. 4760
KELLY H. DOVE, ESQ.
Nevada Bar No. 10569
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV  89169
Telephone (702) 784-5200
Facsimile: (702) 784-5252
E-mail: mstein@swlaw.com
           kdove@swlaw.com

*Attorneys for Plaintiff*
*INTERIM CAPITAL LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| INTERIM CAPITAL LLC, a Florida limited liability company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>THE HERR LAW GROUP, LTD., a Nevada limited liability company; DAVID C. AMESBURY, INC., a Nevada corporation; ALLISON L. HERR, an individual; TRUDE I. MCMAHAN, an individual; VICTORIA ALANO VILLEGAS, an individual; DAVID CLYDE AMESBURY, an individual; and DAVID CLYDE AMESBURY and VICTORIA ALANO VILLEGAS, as Trustees of the AMESBURY/VILLEGAS TRUST U/A/D FEBRUARY 7, 2000,<br><br>                    Defendants.<br>_____<br><br>AND RELATED ACTION. | Case No.   2:09-cv-01606-KJD-LRL<br><br><br><br><br>**FINAL JUDGMENT** |

This matter having come before the Court on Plaintiff's Motion for Summary Judgment and Request for a Valuation Hearing, the Court orders, decrees and adjudicates as follows:

13682630.7

# I.    FINDINGS OF FACT

**A.          Procedural Background**

Interim filed suit in this Court on August 24, 2009 for breach of the various guaranties and other agreements, and seeking a deficiency.  (Doc. #1.)  On September 25, 2009, Defendants filed an Answer and asserted counterclaims for breach of contract and negligence.  (Doc. # 15.)  Interim moved to dismiss the counterclaims on October 14, 2009.  (Doc. #17.)  After a hearing on the matter, this Court granted Interim's motion to dismiss the counterclaims, but allowed Defendants leave to amend their counter-complaint.  (Doc. #26, 29.)  On January 4, 2010, Counterclaiming Defendants filed an amended answer, including an amended counterclaim for breach of contract. (Doc. #28.)  On January 22, 2010, Interim and Defendants Herr Law Group and Allison L. Herr stipulated to dismiss all claims against one another.  (Doc. #30, #36.)  Interim expressly reserved its rights to pursue and continue its claims against the remaining Defendants.  (*Id.*)  Meanwhile, the remaining Defendants[1] joined Borrower 703 to the litigation as a counterclaimant.  (Doc. # 41.)  On January 29, 2010, Interim moved again to dismiss the counterclaims.  (Doc. #31.)  On April 16, 2010, this Court again granted Interim's motion to dismiss, dismissing Defendants' and 703's counterclaims with prejudice.  (Doc. #49, #53.)

On January 3, 2011, Plaintiff filed a Motion for Summary Judgment and Request for Valuation Hearing.  (Doc. #61.) On March 2, 2011, the remaining Defendants filed a response to Plaintiff's Motion.  (Doc. #72.)  On March 18, 2011, Plaintiff filed a Reply.  (Doc. #78.)   On April 18, 2011, the Amesbury Defendants and 703 filed a supplemental brief.  (Doc. #82.) Plaintiff filed a response to the supplemental brief on May 4, 2011.  (Doc. No. 83.) This Court granted Plaintiff's Motion for Summary Judgment.  *See* Order dated August 23, 2011.  (Doc. #85.)

---

[1] Unless otherwise specified, this Order and Judgment apply to the remaining Defendants.

13682630.7

**B.      Material Facts**

      **1.      The Senior Loan Transaction**

       On or about April 18, 2007, 703 South Eighth Street LLC, a Nevada limited liability company (the "Borrower" or "703") executed a promissory note (the "Senior Note") in favor of Silver State Bank ("Silver State") through which the Borrower promised to pay Silver State the principal amount of $2,085,000.00, "together with interest on the unpaid principal balance" thereof (the "Senior Loan").[2]   (MSJ, Exhibit 1.)  On or about April 18, 2007, the Borrower also entered into a "Construction Loan Agreement" (hereafter the "Senior Loan Agreement") with Silver State, in connection with the Senior Note.  (MSJ, Exhibit 2.)  On or about April 15, 2008 and September 4, 2008, the Borrower and Silver State entered into two Change in Terms Agreements with regard to the Senior Loan (the "Senior Loan Change in Terms Agreements").[3] (MSJ, Exhibit 3.)

       The Senior Loan Agreement is "binding upon the signers thereof as well as upon their successors, representatives and assigns," including Interim as successor-in-interest to Silver State and holder of the Senior Note, pursuant to the Senior Allonge.  It is a default under the Senior Note if, *inter alia*, the Borrower "fails to make any payment when due" under the Senior Note, or if Borrower "fails to perform any term, obligation, covenant or condition contained in any other agreement" between Silver State and Borrower.  (Senior Loan Agreement at 2.)  It is likewise a default under the Senior Loan Agreement if, *inter alia*, Borrower "fails to make any payment when due under the Loan," as evidenced by the Junior Note.  (*Id.* at 7.)

      **2.      The Junior Loan Transaction**

       On or about April 18, 2007, the Borrower executed another "Promissory Note" (the "Junior Note") in favor of Silver State through which the Borrower promised to pay Silver State the principal amount of $1,449,500.00, "together with interest on the unpaid principal balance" thereof (the "Junior Loan").  (MSJ, Exhibit 4.)  At the same time, Borrower entered into a

---

[2] The Senior Loan is also referred to in the Senior Loan Documents as "Loan No. 69442."

[3] The Senior Note, the Senior Allonge, the Senior Loan Agreement and the Senior Change in Terms Agreements are hereafter collectively referred to as the "Senior Loan Documents."

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

"Construction Loan Agreement" (hereafter the "Junior Loan Agreement") with Silver State, in connection with the Junior Note.  (MSJ, Exhibit 5.)

Approximately one year later, on April 15, 2008, Borrower and Silver State entered into a Change in Terms Agreement with regard to the Junior Loan (the "Junior Loan Change in Terms Agreement").[4]  (MSJ, Exhibit 6.)  Pursuant to the terms of the Junior Loan Agreement, the Junior Loan Agreement is "binding upon the signers thereof as well as upon their successors, representatives and assigns," including Interim as successor-in-interest to Silver State and holder of the Junior Note, pursuant to the Junior Allonge.  It is a default under the Junior Note if, *inter alia*, Borrower "fails to make any payment when due" under the Junior Note, or if Borrower "fails to perform any term, obligation, covenant or condition contained in any other agreement" between Silver State and Borrower.  (Junior Note at 1.)  It is also a default if, Borrower "fails to make any payment when due under the Loan."  (Junior Note[5] at 7.)

### 3.     The Guaranties

Each Defendant executed a "Commercial Guaranty" dated April 18, 2007 related to the Senior Loan (Loan No. 69442), guaranteeing, among other things, the "full and punctual payment and satisfaction" of "all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, [and] attorneys' fees, arising from any and all debts, liabilities and obligations" of Borrower to Silver State.  (MSJ, Exhibits 8, 10, 11, 12, 13.)

Defendants also collectively executed a "Guaranty of Completion and Performance" dated April 18, 2007 (the "Senior Performance Guaranty"), related to the Senior Loan guaranteeing that Guarantors would, upon the occurrence of an "Event of Default" under the Senior Loan Agreement, "diligently proceed to cure such default."  (MSJ, Exhibit 14.[6])  Under

---

[4]  The Junior Note, the Junior Allonge, the Junior Loan Agreement and the Junior Change in Terms Agreement are hereafter collectively referred to as the "Junior Loan Documents."

[5]  The Junior Loan is also referred to in the Junior Loan Documents as "Loan No. 69450."

[6]  The Senior Amesbury Corp. Guaranty, Senior McMahan Guaranty, Senior Villegas Guaranty, Senior Amesbury Guaranty, Senior Trustee Guaranty and Senior Performance Guaranty are

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

13682630.7

the Senior Performance Guaranty, Guarantors agreed to pay "Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of" the Senior Performance Guaranty. (*Id.*)

Each of the Defendants also executed a "Commercial Guaranty" dated April 18, 2007 related to the Junior Loan (Loan No. 69450), guaranteeing, among other things, the "full and punctual payment and satisfaction" of "all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, [and] attorneys' fees, arising from any and all debts, liabilities and obligations" of Borrower to Silver State. (MSJ, Exhibits 16, 18, 19, 20, 21.)

Defendants collectively executed a "Guaranty of Completion and Performance" dated as of April 18, 2007 (the "Junior Performance Guaranty"), related to the Junior Loan (Loan No. 69450) guaranteeing, among other things, that Guarantors would, upon the occurrence of an "Event of Default" under the Junior Loan Agreement, "diligently proceed to cure such default." (MSJ, Exhibit 22.[7]) Under the Junior Performance Guaranty, Guarantors agreed to pay "Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of" the Junior Performance Guaranty. (*Id.*)

Under the terms of the Guaranties, the Guaranties are "binding upon and inure to the benefit of the parties, their successors and assigns," including Interim as successor-in-interest to the lender's interest of Silver State and holder of the Senior Note and Junior Note, pursuant to the Senior Allonge and Junior Allonge.

**4.  The Defaults**

Borrower is in default under the Senior Note based on failure to make payments under

---

collectively, hereinafter referred to as the "Senior Guaranties."

[7]  The Junior Amesbury Corp. Guaranty, Junior McMahan Guaranty, Junior Villegas Guaranty, Junior Amesbury Guaranty, Junior Trustee Guaranty and Junior Completion Guaranty are collectively, hereinafter referred to as the "Junior Guaranties." The Senior Guaranties and the Junior Guaranties are hereafter collectively referred to as the "Guaranties."

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

13682630.7

the Senior Note since prior to November 2008.  (MSJ, Exhibit 7.)  Borrower's failure to make payments due under the Senior Note constitutes an Event of Default under the Senior Loan Agreement.  (MSJ, Exhibit 9.) The Junior Note likewise matured on September 1, 2008 and to date Borrower has failed to pay the full amount owing under the Junior Note upon maturity. Borrower's failure to pay the Junior Note upon maturity constitutes an Event of Default under the Junior Loan Agreement.

On or about May 4, 2009, Interim provided written notice to Borrower and Guarantors of the default under the Senior and Junior Loan Documents, including written demands for payment and indicating that Interim "reserves the right to exercise all remedies contained" in the Senior and Junior Loan Documents, including action to enforce the Senior and Junior Guaranties. (MSJ, Exhibits 23-24.)

**5.      The Foreclosure Sale**

On July 15, 2009, a Notice of Default and Election to Sell Under Deed of Trust was recorded with the Clark County Recorder commencing a foreclosure under the deed of trust that secured the Junior Loan.  (MSJ, Exhibit 15.)  Upon expiration of all statutorily prescribed periods under NRS 107.080, the Trustee, First American Title Insurance Company noticed the sale of the Property in compliance with NRS 107.080(4).  (MSJ, Exhibit 17.)  On November 12, 2009, after complying with all relevant statutes and the Deed of Trust, the Trustee held a sale of the Property. (MSJ, Exhibit 25.)  At the time of the November 12, 2009 Trustee's Sale, the combined balance due on the Junior Not and the Senior Note, exclusive of interest, attorneys' fees, costs, and expenses of foreclosure, and all other charges, was $3,422,343.94.  At the Trustee's Sale, the Trustee sold the Property to Interim Holdings, LLC (subject to the deed of trust securing the Senior Loan) for the highest and best bid of $500.00.  (MSJ, Exhibit 25.)  The fair market value of the Property, as of the date of the sale, November 12, 2009, was $2,100,000.00.  (MSJ, Exhibit 26.)

**6.      Requirements under NRS 40.457**

This Court held a hearing on Interim's Motion for Summary Judgment and Valuation in accordance with NRS 40.457.  Interim provided an expert's appraisal indicating the properties'

1   values as the date of the sales. (**Exhibit 26**.)   Defendants did not contest the appraisal's
2   conclusions.

## II.   CONCLUSIONS OF LAW

There is no genuine issue of material fact that the remaining Defendants entered the binding guaranties described above, that the Borrower defaulted, and that Defendants are now responsible for the deficiency amounts.  Interim is therefore entitled to summary judgment.

### A.   Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  *Id.*

The question of the interpretation of a contract when the facts are not in dispute is a question of law.  *Fed. Ins. Co. v. Am. Hardware Mut. Ins. Co.*, 184 P.3d 390, 392 (Nev. 2008); *Shelton v. Shelton*, 119 Nev. 492, 497, 78 P.3d 507, 510 (2003).  Construction of a contractual term is a question of law. *NGA #2 Ltd. Liability Co. v. Rains*, 946 P.2d 163, 167 (Nev. 1997).  In reviewing a contract, the court should look to the plain meaning of the contract terms and apply meaning to all the contract's provisions.  *Valucar v. Coachmen Recreational Vehicle Co.*, 2009 WL 3191715, at *1 (Nev. 2009).

### B.   Interim's Claim for Deficiency

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

Interim is entitled to recover any deficiency remaining after the foreclosure of the Property.

### 1.     Breach of Guaranties

The Senior and Junior Guaranties are valid and enforceable contracts between Plaintiff and each Defendant.   Pursuant to the terms of each Guaranty, each Defendant waived the provisions of NRS § 40.430, as permitted pursuant to NRS § 40.495.   Plaintiff has fully performed its obligations under the Loan Documents, and the Guaranties.   Defendants have breached the Guaranties by failing to pay when due all indebtedness of Borrower to Plaintiff under the Senior Note as required pursuant to the terms of the Senior Guaranties.   Defendants have likewise breached the terms of the Junior Guaranties by failing to pay when due all indebtedness of Borrower to Plaintiff under the Junior Note as required pursuant to the terms of the Junior Guaranties.

The Senior and Junior Performance Guaranties also are valid and enforceable contracts between Interim and Defendants.   Interim has fully performed its obligations under the Loan Documents, the Senior Performance Guaranty and the Junior Performance Guaranty. Defendants have breached the terms of the Senior Performance Guaranty by failing to diligently proceed to cure Borrower's default under the Senior Loan Documents based on Borrower's failure to make payments when due under the Senior Note, resulting in acceleration of the Senior Note.   Defendants have breached the terms of the Junior Performance Guaranty by failing to diligently proceed to cure Borrower's default under the Junior Loan Documents based on Borrower's failure to pay all amounts due and owing under the Junior Note.

### 2.     Plaintiff is Entitled to a Deficiency Judgment Against Defendants

Chapter 40 of the Nevada Revised Statutes governs deficiency judgments.   Upon compliance with Chapter 40, "the court shall award a deficiency judgment to the judgment creditor or the beneficiary of the deed of trust if it appears from the sheriff's return or the recital of consideration in the trustee's deed that there is a deficiency of the proceeds of the sale and a balance remaining due to the judgment creditor or the beneficiary of the deed of trust, respectively." NRS 40.455(1) (emphasis added).   The deficiency for which Defendants are liable,

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   pursuant to NRS 40.459 and the Loan Documents, is set forth below along with all relevant and

2   required information regarding the trustee's sales of the Property and its fair market value.

3       **3.      Calculation of the Deficiency Under NRS 40.459**

4       NRS 40.459 limits the amount of a deficiency judgment to the lesser of: (1) the amount by

5   which the amount of the indebtedness which was secured exceeds the fair market value of the

6   property sold at the time of the sale, with interest from the date of the sale; or (2) the amount

7   which is the difference between the amount for which the property was actually sold and the

8   amount of the indebtedness which was secured, with interest from the date of sale.

9       In this case, the fair market value of the Property exceeded the amount for which it

10  actually sold (the "Purchase Price"). Thus the maximum amount Interim may recover on both the

11  Senior and Junior Loans is the total amount of the indebtedness on the Property minus the

12  Property's fair market value.  Accordingly, Interim is entitled to the following amounts:

13      The total secured principal indebtedness is $3,422,343.94, exclusive of accrued interest,

14  late fees, and Trustee Costs.  This amount is comprised of the $2,084,918.38 remaining on the

15  Senior Loan and $1,337,425.56 outstanding on the Junior Loan.

16      Unpaid interest on the Senior Loan to May 1, 2009 totals $89,751, and the amount from

17  May 1, 2009 to November 12, 2009 (the date of the sale) is $82,553.25 ($423.35 per day over 195

18  days).    Thus, as of the date of the sale, the total interest owed on the Senior Loan was

19  $172,304.25 ($89,751.00 + $82,553.25).  Unpaid interest on the Junior Loan to May 1, 2009

20  includes $65,923.93, and the amount from May 1, 2009 to November 12, 2009 is $47,088.60

21  ($241.48 per day over 195 days).  Thus, as of the date of the sale, the total interest owed on the

22  Junior Loan is $113,012.53  ($65,923.93 + 47,088.60).  Accordingly, the total interest due on

23  both Loans is $285,316.78.  Added to the outstanding principal, the total indebtedness exclusive

24  of late fees and trustee costs is $3,707,660.72.

25      The fair market value of the property at the time of the November 2009 Trustee's sale was

26  $2,100,000.00.  Because this amount is greater than the Purchase Price, it provides the basis for

27  determining the deficiency. Thus, the amount of the principal deficiency judgment to which

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

13682630.7

1  Interim was entitled as of the date of the sale was $1,607,660.72 (the difference between

2  $3,707,660.72 and $2,100,000.00), not including fees, and Trustee Costs.

3        Each Defendant guarantor is jointly and severally liable for these amounts.

4        **4.        NRS 40.451 Does Not Affect the Calculation of the Deficiency.**

5        At the hearing on the instant motion, Defendants argued that NRS 40.451 limits the

6  amount a creditor may recover on a deficiency to the amount it paid to acquire the interest in the

7  debt.  This Court allowed Defendants supplemental briefing on this issue.  Defendants' argument,

8  however, is without merit.

9        It is well established that an assignee "stands in the shoes" of the assignor and succeeds to

10  all rights of the assignor.  The general rule of assignments is that the transferee has the same

11  rights as the transferor.  4 Powell on Real Property § 37.27[5] (citing 4 Corbin on Contracts § 861

12  (1951)).  The assignee merely steps into the shoes of the assignor.  *Id.*   The Nevada Supreme

13  Court cites Corbin on Contracts for the same proposition.  "After notice of [an] assignment has

14  been given to the obligor . . . the assignor has no remaining power of release.  The obligor must

15  pay the assignee." *Wood v. Chicago Title Agency*, 847 P.2d 738, 739 (Nev. 1993) (*citing* 4 Corbin

16  on Contracts § 890 (1951)).  This rule is also codified in the Uniform Commercial Code as

17  adopted by the State of Nevada: "Transfer of an instrument, whether or not the transfer is a

18  negotiation, vests in the transferee any right of the transferor to enforce the instrument."  NRS

19  104.3203.

20        The Minnesota Court of Appeals recently explained that the common law of *most states*,

21  has long recognized that "[a]n assignment operates to place the *assignee in the shoes of the*

22  *assignor*, and provides the assignee with the same legal rights as the assignor had before

23  assignment." *Ill. Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 803 (Minn. 2004)

24  (emphasis added); *see generally* Restatement (Second) of Contracts § 317 (1981) (Assignment of

25  a Right); *see also Mountain Peaks Fin. Servs., Inc. v. Roth-Steffen*, 778 N.W.2d 380, 385 (Minn.

26  App. 2010); *accord, e.g.*, *LPP Mortgage, Ltd. v. Boutwell*, 36 So.3d 497 (Ala. 2009); *Fin. Fed.*

27  *Co. v. Noe*, 983 S.W.2d 107 (Ark. 1998); *Nat'l Loan Investors Ltd. P'ship v. Heritage Square*

28  *Assocs.*, 733 A.2d 876 (Conn. App. 1999); *Anderson v. Burson*, 9 A.3d 870 (Md. App. 2010);

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

1   *Credigy Receivables, Inc. v. Whittington*, 689 S.E.2d 889 (N.C. App. 2010); *Global Fin. Servs.,*

2   *Inc. v. Duttenhefner*, 575 N.W.2d 667 (N.D. 1998); *Fed. Fin. Co. v. Gerard*, 90 Wn. App. 169

3   (Wash. 1998).

    a.   *Defendants' Proffered Interpretation of NRS 40.451 Is at Odds with its*
         *Plain Meaning.*

5

6       In *State v. Lucero*, 127 Nev. Adv. Rep. 7 (March 17, 2011), the Nevada Supreme Court

7   outlined its methodology for interpreting a Nevada statute.   The Court explained that "when

8   interpreting a statute, legislative intent 'is the controlling factor.'" *Id.* (citing *Robert E. v. Justice*

9   *Court*, 99 Nev. 443, 445, 664 P.2d 957, 959 (1983)). The "starting point for determining

10  legislative intent is the statute's plain meaning; when a statute 'is clear on its face, a court can not

11  go beyond the statute in determining legislative intent.'" *Id.* ("We must attribute the plain

12  meaning to a statute that is not ambiguous."). Only when "the statutory language lends itself to

13  two or more reasonable interpretations and the statute is ambiguous," may the Court then look

14  beyond the statute in determining legislative intent.   *Id.* To interpret an ambiguous statute, the

15  Court may "look to the legislative history and construe the statute in a manner that is consistent

16  with reason and public policy." *Id.* citing (*Great Basin Water Network v. State Eng'r*, 126 Nev.

17  Adv. Rep. 20, 234 P.3d 912, 918 (2010); *see also Moore v. State*, 122 Nev. 27, 32, 126 P.3d 508,

18  511 (2006) (looking to legislative history to determine legislative intent behind ambiguous

19  statute); *Robert E.*, 99 Nev. at 445-48, 664 P.2d at 959-61 (looking to legislative history, reason,

20  and public policy to determine legislative intent behind ambiguous statute)).   This process is

21  consistent with the way federal courts interpret federal statutes. *See Freytag v. Comm'r*, 501 U.S.

22  868 (1991).

23      At issue here is the provision defining "indebtedness" in the section entitled "Foreclosure

24  Sales and Deficiency Judgments."   NRS 40.451 lists the types of debt and expenditures that

25  constitute indebtedness:

26       As used in NRS 40.451 to 40.463, inclusive, "indebtedness" means
         the principal balance of the obligation secured by a mortgage or
27       other lien on real property, together with all interest accrued and
         unpaid prior to the time of foreclosure sale, all costs and fees of
28       such a sale, all advances made with respect to the property by the
         beneficiary, and ***all*** ***other amounts*** **secured by the mortgage or**

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

> ***other lien*** on the real property in favor of the person seeking the deficiency judgment. ***<u>Such amount</u> constituting a lien*** is limited to the amount of the consideration paid by the lienholder.

NRS 40.451 (emphasis added).  Defendants argue that the last sentence of NRS 40.451 should be considered in isolation and functions to limits the entire indebtedness to the amount a purchaser of a note paid for that note. That, however, does not accord with its plain meaning.

As noted above, "indebtedness" under NRS 40.451 includes six categories of indebtedness with: (1) the principal owed; (2) interest; (3) costs; (4) trustee's fees; (5) advances made during the period of foreclosure, such as insurance and taxes; (6) *all other amounts* secured by the mortgage or other lien.  The last sentence of NRS 40.451 modifies only the last omnibus or catch-all category in the list of items comprising indebtedness.  The words "such amount" refers back to "all other amounts" noted in the last category, and not the indebtedness as a whole.[8]  Indebtedness is not defined as an "amount," but rather a list of types of obligations.  Grammatically, "such amount" cannot reasonably reference "indebtedness" in this context, as indebtedness is not described as an "amount," but rather a collection of categories.  Moreover, if the last sentence was meant to limit the total amount of indebtedness, the statute would say so, likely by stating that "Indebtedness is limited to the amount of consideration paid by the mortgagee" or even "Such indebtedness…"  The statute says no such thing.

And, in any event, such a limitation would be out of place in NRS 40.451.  This is because NRS 40.451 is definitional.  Titled, "Indebtedness defined," it catalogues what may comprise indebtedness for the purposes of the following substantive provisions in the section.  Other statutory provisions in the same section specifically address limitations on recovery of a deficiency, such as NRS 40.459, appropriately titled "Limitations on amount of money judgment."  Had the Legislature intended to apply an additional limitation, it would more likely be found in section 459.

When the Legislature enacted NRS 40.451 in 1969, the sentence, "Such amount constituting a lien…." was added by an amendment to AB 493 in the Assembly Committee on

---

[8] "Such" is an adjective meaning "of the character, quality, or extend *previously indicated or implied*."  Merriam Webster's Collegiate Dictionary 1176 (10th ed. 1993) (emphasis added).

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Judiciary prior to passage of AB 493 by the full Assembly and Senate and approval by the Governor.   During the Hearing on AB 493 before the Assembly Committee on Judiciary, 55th Session on March 13, 1969, Assemblyman Richard Bryan[9] moved "Do Pass AB 493" with the proposed amendments that added the definition of "indebtedness" and noted that the last sentence of NRS 40.451 equates to the "lender being limited to actual out of pocket expenses that he may recover." Hrg. on AB 493 Before the Assembly Comm. on Judiciary, 55th Sess., March 13, 1969, at 11.   The motion carried. *Id.* at 12.   Assemblyman Bryan's comment was brief, but revealing. That the sentence refers to actual out of pocket expenses is evidence that the statement modifies the catch-all "other amounts" as opposed to indebtedness generally.   Bryan also mentions lenders—not secondary purchasers.

Finally, Defendants cannot account how their interpretation would apply to a primary lender.   Certainly, it must, not only because of the statutory language, but also in light of Assemblyman Bryan's description.    In contrast, should the last sentence be read to modify "all other amounts," the application to a primary lender is clear; indebtedness includes the principal, interest, and, *inter alia*, the lender's actual expenses, but not soft costs, such as the lender's operating costs, lost profits, etc.

b.    *Statutory Context*

Nevada's deficiency legislation is meant to ensure fairness—to both creditors and obligors—in the context of a foreclosure sale. *See First Interstate Bank of Nev. v. Shields*, 730 P.2d 429, 431 (Nev. 1986).   One way to ensure fairness to obligors is to limit the amount of a deficiency judgment "to the amount by which the debt exceeds the greater of the fair market value of the security on the date of the foreclosure sale or the amount bid at such sale by the creditor." *Uruh v. Streight*, 615 P.2d 247, 248 (Nev. 1980).   "[O]bligors are assured that creditors in Nevada may not reap a windfall at an obligor's expense by acquiring the secured realty at a bid price unrelated to the fair market value of the property and thereafter proceeding against available obligors for the difference between such a deflated price and the balance of the debt." *Shields*,

---

[9] Richard Bryan was elected to the Nevada Assembly in 1968, later went on to the Nevada Senate, and then served two terms as Governor before serving in the U.S. Senate.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

730 P.2d at 431.  In short, the Nevada Legislature ensured that creditors would not be able to recoup a "double recovery" by realizing payment of an artificially large deficiency as well as obtaining the property at issue.  *United States v. MacKenzie*, 510 F.2d 39, 42 (9th Cir. 1975); *Carrillo v. Valley Bank of Nev.*, 734 P.3d 724, 725 (Nev. 1987).

The reference in NRS 40.451 to the "consideration paid by the lienholder" has no plausible connection to limiting the amount of the lien that may be obtained by way of an assignment of the underlying security.  Further, application of this interpretation of the statute can lead to absurd results certainly not intended by the Nevada Legislature.  Under Defendants' interpretation of NRS 40.451, an heir who inherited the rights under a promissory note and deed of trust or a family that transferred its rights under a promissory note and deed of trust to a family trust would be barred from recovering on a deficiency judgment simply because it did not pay consideration for the transfer.  Applying Defendants' interpretation to NRS 40.451 would give borrowers in these situations a windfall should a foreclosure occur, the foreclosed property have a fair market value lower than the actual indebtedness and the assignees of the notes and deeds of trust be prevented from seeking a deficiency judgment merely because they inherited the property or assigned the property to their own family trust.  This is exactly what the statutory scheme governing deficiency judgments seeks to prevent – windfalls and unjust results.

c.   *Defendants' Interpretation of NRS 40.451 Is Preempted by Federal Law*

The Supremacy Clause in Article VI of the Constitution provides that "[t]his Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, § 2, cl. 2.  Congress therefore has constitutional authority to preempt state law.  *E.g.*, *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989).

Preemption is a question of federal law. *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 388 (1986).  Accordingly, the United States Supreme Court's preemption jurisprudence binds all other tribunals, both federal and state.  *See, e.g., South Carolina v. Bailey,*

289 U.S. 412, 420 (1933). Congress may preempt state law in three ways. *E.g.*, *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). First, "Congress can define explicitly the extent to which its enactments preempt state law." *Id.* at 78. Second, "in the absence of explicit statutory language," state law may be implicitly "pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *Id.* at 79; *see Pub. Util. Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc.*, 379 F.3d 641, 647 (9th Cir. 2004). Third, "state law is pre-empted to the extent that it actually conflicts with federal law." *English*, 496 U.S. at 78; *Grays Harbor*, 379 F.3d at 648–50. Here, the third—conflict preemption—displaces Defendants' proposed interpretation of NRS 40.451.

Federal law is clear that an assignee stands in the shoes of his assignor. *FDIC v. Bledsoe*, 989 F.2d 805, 810 (5th Cir. 1993); *Leasing Serv. Corp. v. River City Constr.*, Inc., 743 F.2d 871 (11th Cir.1984); *Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266 (2d Cir.1983); *State Mut. Life Assurance Co. of Am. v. Deer Creek Park*, 612 F.2d 259 (6th Cir.1979). And, assignees of the FDIC have the right to step into the shoes of the FDIC and obtain its rights under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). *Fall v. Keasler*, 1991 U.S. Dist. LEXIS 18771, at *12-13 (N.D. Cal. Dec. 18, 1991); *see also Bledsoe*, 989 F.2d at 810.

Federal courts have recognized Congress's "policy of protecting failed institutions' assets." *Bledsoe*, 989 F.2d at 811; *Fall v. Keasler*, 1991 U.S. Dist. LEXIS 18771, at *12-13 (N.D. Cal. Dec. 18, 1991). One rationale for protecting assignees is because to relegate assignees to state law would "serve only to shrink the private market for the assets of failed banks." *Fall*, 1991 U.S. Dist. LEXIS 18771, at *12-13. Additionally, "there is no legal or economic sense in a rule that would permit the maker of a note who has an enforceable legal obligation to the FDIC to escape enforcement of the very same obligation by the FDIC's assignee." *Id.*

To that end, assignees of the FDIC are given special consideration under federal law so as to maintain the value of these assets, especially notes in default. For example, courts have unanimously held that assignees partake of the FDIC 's statutory "super" holder-in-due-course status pursuant to statute and the doctrine of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447

LAW OFFICES
Snell & Wilmer
L.L.P.
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   (1942).  *Id.* (citing *Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244, 1249 (5th Cir. 1990); *Bell &*

2   *Murphy & Assocs. v. Interfirst Bank Gateway*, 894 F.2d 750, 754 (5th Cir.); *In re Hood*, 95

3   Bankr. 696, 700-01 (W.D. Mo. Bankr. 1989); *FDIC v. Newhart*, 713 F. Supp. 320, 324 (W.D.

4   Mo), aff'd, 892 F.2d 47 (8th Cir. 1989); *RSR Props., Inc. v. FDIC*, 706 F. Supp 524, 531 (W.D.

5   Texas 1989)).

6       Likewise, FDIC assignees are entitled to the six-year statute of limitations under FIRREA

7   rather than any shorter applicable state statute of limitations.  A short limitations period would

8   thwart the goal of maintaining the value of failed banks' assets because the FDIC would have to

9   hold onto and prosecute all notes for which the state statute of limitations has expired because

10  such obligations would be worthless to anyone else.  *Fall*, 1991 U.S. Dist. LEXIS 18771, at *12-

11  13; *see also United States v. Thornburg*, 82 F.3d 886 (9th Cir. 1996).  Restricting assignees of the

12  FDIC under state law "runs contrary to the [federal] policy of allowing the FDIC to rid the federal

13  system of failed bank assets. The FDIC can only make full use of the market in discharging its

14  statutory responsibilities if the market purchasers have the same rights to pursue actions against

15  recalcitrant debtors as does the FDIC."  *Fall*, 1991 U.S. Dist. LEXIS 18771, at *12-13.

16      Under federal law, Interim is entitled to step into the FDIC's shoes and pursue the full

17  value of the borrowers' and guarantors' obligation.  Defendants' interpretation of Nevada law

18  conflicts with that federal entitlement and is therefore preempted.  Capping Interim's recovery at

19  the price of its investment would mean that Interim is not being permitted to step into the shoes of

20  the FDIC, and therefore conflicts with federal law and policy.[10]

21      Defendants are therefore liable for the full amount of the deficiency under NRS 40.459,

22  together with interest, fees, transfer tax payments, trustee costs, attorney fees and costs, and post-

23  judgment collection fees and costs.  (Doc. #85.)

24      **5.      Legal Fees and Costs**

25  ─────────────────────

26  [10] Interim also notes that Defendants assert that Interim paid $1,553,973 to the FDIC for this note.
    While Interim contends that this allegation is irrelevant, given the statutory interpretation of NRS

27  40.451, neither does it concede to that amount.  Moreover, Defendants have failed to produce any
    evidence of this allegation, even during this opportunity to supplement their summary judgment

28  briefing; this failure should independently entitle Interim to summary judgment for the full value
    of the note.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA  89169
(702) 784-5200

13682630.7

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Interim has employed legal counsel to prosecute this action and, pursuant to the terms of the Loan Documents, Interim is further entitled to recover its costs, expenses, and reasonable attorneys' fees incurred after the Trustee's Sale and/or in prosecuting this action, including but not limited to post-judgment collections' fees and costs.  Interim may apply for fees and costs in accordance with Federal Rule of Civil Procedure 54.  Interim also is entitled to recover the transfer tax for the foreclosure sale, which was $9,544.65.  (MSJ, Exhibit 25.)  Finally, Interim is entitled to the trustee costs associated with the sale, totaling $9182.90.  (#88, Exhibits 1, 2, and 3.)

### III.   JUDGMENT

Having made the foregoing findings of fact and conclusions of law, this Court enters the following Orders and Final Judgment in form for Plaintiff and against Defendants, jointly and severally:

**IT IS HEREBY ORDERED THAT** Final Judgment is entered in favor of Plaintiff INTERIM CAPITAL LLC, and against Defendants, David C. Amesbury, Inc., David Clyde Amesbury, David Clyde Amesbury and Victoria Alano Villegas, as Trustees of the Amesbury/Villegas Trust U/A/D February 7, 2000, and 703 South Eighth Street, LLC, as to all counts alleged in the Complaint on record with damages awarded as follows:

1.     Plaintiff is awarded damages in the amount of $1,626,388.27 (deficiency amount of $1,607,660.72     + transfer tax of $9,544.65 + trustee costs associated with the sale of $9182.90) for which the remaining Defendants are jointly and severally liable;

2.     Plaintiff is entitled to prejudgment interest on its damages of $1,626,388.27 in the amount of $234,032.81.[11]

---

[11]  Interim foreclosed on the Junior Note, and the foreclosure satisfied the Junior Note. ($1,337,425.56 was owing on the Junior Note, so the $2.1 million fair market value of the property satisfied that Note.)  Prejudgment interest was calculated based on the contract interest rate for the remaining indebtedness on the Senior Note.  That interest rate is the FHLBS 5-year rate as of September 1, 2008 plus 3.00%.  (*See* MSJ, Exhibits 1 and 3.)  The FHLBS 5-year rate as of September 1, 2008 was 4.45%, so the applicable rate is 4.45% + 3.00%, which totals 7.45%. Interest of 7.45% on the amount due of $1,626,388.27 from the date of the sale (November 12, 2009) to the date of this judgment's submission, October 18, 2011, is $234,032.81.

3.      Plaintiff is entitled to costs in an amount for which Plaintiff will apply separately.

4.      Plaintiff is entitled to an award of attorney's fees in an amount for which Plaintiff will apply separately.

5.      Pursuant to 28 U.S.C. § 1961, Plaintiff is entitled to an award of post-judgment interest in an amount to be determined based on the weekly average 1 year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment until the judgment is satisfied in full.

**IT IS SO ORDERED** this <u>21</u> day of <u>October</u>, 2011.

_____
Honorable KENT J. DAWSON
U.S. District Court Judge

Submitted by:

<u>  /s/   Kelly H. Dove          </u>
MICHAEL STEIN, ESQ.
Nevada Bar No. 4760
KELLY H. DOVE, ESQ.
Nevada Bar No. 10569
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV  89169

*Attorneys for Plaintiff*
*INTERIM CAPITAL LLC*

13682630.7